FRED W. KLECKAMP, JR., by Next Friend, FRED W. KLECKAMP, SR., v. GEORGE W. LAUTEN-SCHLAEGER et al., Appellants.

Division One, November 25, 1924.

1. **NEGLIGENCE:** Automobile: Evidence: Employment of Inexperienced Driver: Speed. In an action by a bicycle-rider, injured when he was struck by defendants' automobile, driven by their employee, where no evidence bearing on the competency or incompetency of the driver was offered by plaintiff in his case in chief, nor of any previous acts of negligence of the driver, and the driver on his direct examination has testified that at the time of the collision the automobile was running about five miles per hour, the plaintiff on cross-examination of the driver has a right, as a means of testing the weight of his testimony, to question him as to his experience, accuracy and means of knowing the speed of the automo-

Kleckamp v. Lautenschlaeger.

bile. Such questions on cross-examination, under such circumstances, are not incompetent on the theory that defendants are not liable as for actionable negligence for their failure to employ an efficient and experienced driver, but are competent as a means of testing the accuracy of the driver's estimate of the speed.

2. **PRACTICE: Cross-Examination: Discretion of Court.** The scope of the cross-examination of a witness is a matter which must be left largely to the discretion of the trial court, and unless that discretion is abused the appellate court is reluctant to pronounce the cross-examination error.

3. **PERSONAL INJURY: Excessive Verdict: Eight Thousand Dollars.** Plaintiff was fourteen years of age; his right leg was broken about midway between the hip and knee; he was confined to his bed at home for seven weeks, with a heavy weight and pulley attached to the leg; taken to a hospital, he remained in bed nine weeks; the bones overlapped, and refused to come into apposition; after two weeks, the tissues were cut open, the muscles stretched until the broken ends of the bones came together, and a silver plate four inches long inserted to hold them, and the leg placed in a plaster cast extending from his toes to his chest; taken home, he was kept in bed for two months, then sat in a wheel chair for a month, then walked on crutches for a time, and then with the aid of a cane; the leg is an inch shorter than the other, one hip is tilted in walking, and his body is lopsided; there is still pain in the muscles of the tilted side; there is not full flexion at the knee; in case of another injury the silver plate would have to be removed, by cutting the leg open, and that might cause infection or blood-poisoning. *Held*, that a verdict for eight thousand dollars, though a round sum, is not so excessive as to justify an interference by the appellate court.

4. ————: ————: **Appellate and Trial Practice.** The appellate court is not bound by the verdict of a jury in a personal injury case where they have been more liberal than just; but the law places the duty upon the jury, in the first instance, of determining the amount of damages to be awarded, and, as they view the injured party and hear his witnesses, they have better opportunity of measuring his injuries than the appellate court, which will defer largely to their judgment.

Citations Relating to Subject of Headnotes: 1, Witnesses, 40 Cyc. 2489, 2490; (2) Appeal and Error, 4 C. J. par. 2797, and Witnesses, 40 Cyc. 2506; 3, Damages, 17 C. J. par. 436; 4, Appeal and Error, 4 C. J. par. 2848, and Damages, 17 C. J. par. 181.

Appeal from St. Louis City Circuit Court.—*Hon. Charles W. Rutledge,* Judge.

AFFIRMED.

*Bryan, Williams & Cave* for appellants.

(1)  In a suit against the owner of an automobile for the injuries caused by his servant or driver, the competency or incompetency of the servant as a driver is immaterial, and the court erred in admitting, over defendant's objection, evidence tending to show that the defendants' driver was an incompetent chauffeur.  Carlson v. Connecticut Co., 8 A. L. R. 569, and note; Central Railroad & Banking Co. v. Roach, 64 Ga. 635; Towle v Pacific Imp. Co., 98 Cal. 342; Fonda v. Ry. Co., 71 Minn. 38; Cunningham v. Ry. Co., 115 Cal. 561; Langsford v. Electric Ry. Co., 174 Cal. 729; Wallis v. Southern Pac. Co., 184 Cal. 662; American Strawboard Co. v. Smith, 94 Md. 19; Maguire v. Middlesex Railroad, 115 Mass. 239.  Nor was this evidence as to the driver's incompetency rendered material or admissible by any evidence offered by the defendants.  The driver had been asked no questions by the defendants to answer which required any experience in driving an automobile.  (2) The verdict is excessive and is so excessive as to require a *remittitur*.

*Frank H. Haskins* for respondent.

(1)  Regardless of whether the questions asked Vawter regarding the extent of his experience in driving a machine were competent for the purpose of proving negligence, they were competent to show his knowledge regarding facts he testified to as to the speed he was driving and the space in which a machine could be stopped.  Aston v. Transit Co., 105 Mo. App. 231; Walsh v. Mo. Pac. Ry. Co., 102 Mo. 586; Gourley v. Railway, 35

Mo. App. 92; Berry on Autos (3 Ed.) secs. 991, 1012; Johnson v. Bay State Railroad Co., 222 Mass. 583. (2) The questions asked Vawter regarding the extent of his experience in driving a machine were competent for the purpose of showing negligence. Jones v. Co-Operative Assn., 109 Me. 448; Fisher v. Railroad Co., 141 Wis. 515; Chrisman v. Belt Ry. Co., 110 La. 640; Williams v. Edmunds, 75 Mich. 92; Vernon v. Cornwall, 104 Mich. 62; Broadstreet v. Hall, 168 Ind. 192; Ill. Cen. Ry. Co. v. O'Neil, 100 C. C. A. 658; Blalack v. Blacksher, 11 Ala. App. 544; Blumenthal v. Electric Co., 129 Iowa, 322. (3) It is competent to show reckless habits or incompetence of a servant to show that his conduct on the occasion of the injury was in keeping with these habits. Craven v. Cen. Pac. Ry., 72 Cal. 348; Vicksburg Ry. v. Patton, 31 Miss. 194; State v. Boston & Maine Ry., 58 N. H. 410.

SEDDON, C.—Suit by plaintiff, a minor, by next friend, against defendants, who are copartners, doing business under the firm name of Lautenschlaeger Brothers, to recover damages for personal injuries.

Plaintiff was riding a bicycle and was run down and struck from the rear by defendants' automobile, driven by an employee while upon defendants' business.

The petition pleads an ordinance of the city of St. Louis requiring a vehicle, except when passing a vehicle ahead, to keep as near the right-hand curb as possible, and, when overtaking and passing another vehicle, to keep to the left. The petition charges defendants with negligence in these respects: (1) Defendants saw, or by exercise of ordinary care could have seen, plaintiff in front of and in imminent peril of being struck by defendants' automobile, in time thereafter, by exercise of ordinary care with the means at hand and with safety to the driver and occupants, to have slowed down the speed, stopped, or turned said automobile so as to have avoided striking plaintiff, but negligently failed to do so; (2)

failure to give any signal or sound to warn plaintiff of his danger; (3) failure to keep as near the right-hand curb as possible; (4) attempting to pass plaintiff on the right-hand instead of on the left-hand side; (5) defendants' automobile was operated by a chauffeur under the age of eighteen years and who had not been licensed as a chauffeur, and defendants knew, or by the exercise of ordinary care, would have known these facts

The answer is a general denial and a plea of contributory negligence.

Plaintiff, a boy fourteen years of age, was injured on August 23, 1920. He was riding a bicycle north on Florissant Avenue in St. Louis, at or near its intersection with Adelaide Avenue. Florissant Avenue is a north-and-south street, and Adelaide Avenue is an east-and-west street. Plaintiff was carrying a package in his left hand and guiding his bicycle with his right hand. Defendants' place of business was on Florissant Avenue, a short distance from Adelaide Avenue. When plaintiff passed defendants' store, defendants' automobile was still standing in front of the store, about forty-three feet south of the south line of Adelaide Avenue. A plat in evidence shows Adelaide Avenue to be sixty feet wide, having a roadway of thirty-six feet in the center. There is a car track on Florissant Avenue twenty-two feet distant from the east or right-hand side of that street.

Plaintiff testified that, when he approached defendants' automobile, he swung out to the left until he was about two or three feet from the car track. After he had passed the automobile, he started to swing toward the right and, after reaching the middle of Adelaide Avenue, he continued north in a straight line parallel with the car track and did not swing any more either to the right or left. When he started straight ahead, he was about half way between the curb and car track, maybe a foot or two closer to the car track.

One of the defendants testified that the whole width of Adelaide Avenue was between the automobile truck

and the boy when he began to swing over toward the right, and "the farthest I saw the boy get from the car track was between four and five feet. He was never farther than four or five feet from the car track and during that time he never got closer to the car track than four feet. He never went more than a foot out of a straight line. The boy was about four or five feet from the car track when he was struck." Witness heard no horn sounded to warn plaintiff of his danger, although there was a horn on the car. The evidence tends to show that plaintiff was struck approximately twenty-five feet north of the building line on the north side of Adelaide Avenue.

The driver of the automobile, Claude Vawter, testified, as a witness for defendants, that plaintiff was about the middle of Adelaide Avenue when he first saw him. The automobile engine had just been started and the automobile had not then moved from its position. Plaintiff was going north "zig-zagging" to the right, and after the automobile started and had reached the middle of Adelaide Avenue, witness began to put on the brakes. He kept his eyes on plaintiff from that time on. On direct examination, witness testified the automobile was running five miles an hour and, on cross-examination, that it was traveling about seven miles an hour. He further testified he could stop the automobile, going seven miles an hour on that street, in eight or ten feet, and after he saw plaintiff "zig-zagging" the automobile traveled about forty feet before he stopped it. The left fender of the automobile struck the rear wheel of the bicycle, causing plaintiff to fall sideways toward the car track.

Witness Herbert Vicks testified on behalf of plaintiff that he was riding in the automobile with the driver, Vawter, when plaintiff was hit. When the machine started up plaintiff was about the middle of Adelaide Avenue, about five feet from the car track, going north. After plaintiff passed the center of Adelaide Avenue he did

not swing any toward the right, but went in a straight line parallel with the street car track. The automobile was going about ten miles an hour and plaintiff was going about five miles an hour.

Appellants' abstract of the record recites that "there was evidence for plaintiff tending to prove the allegations of the petition as to the negligence of the defendants in the operation of said automobile, and there was evidence sufficient to justify the submission of plaintiff's case to the jury on the last-chance doctrine."

The jury returned a verdict in favor of plaintiff for $8000, upon which judgment was entered. After unsuccessfully seeking a new trial, defendants were allowed an appeal to this court.

Only two points are urged by appellants in their assignment of errors: (1) The alleged improper admission of certain testimony and (2) that the verdict is excessive. We will pass upon them in their order.

I. Appellants insist that the trial court erred in admitting, over their objection, certain evidence tending to show that their driver and employee, Claude Vawter, was an incompetent and inexperienced chauffeur.

**Inexperienced Driver.**

The appellants offered but two witnesses, Charles Lautenschlaeger, and their driver, Claude Vawter. On cross-examination of defendant Lautenschlaeger, the following occurred:

"Q. Did he [defendants' driver] show you a chauffeur's license? A. No, sir.

"Judge CAVE: I object to that as irrelevant and immaterial in this case. That does not throw any light on how this accident happened. The question is how the accident happened.

"MR. HASKINS: That point is raised upon motion to strike that out in the petition. We have pleaded that as one ground of negligence. His motion to strike out that part of my petition was overruled. However, I will withdraw the question to save time."

The driver, Vawter, testified on direct examination:

"Q.   I believe you had just gone to work for Lautenschlaeger Brothers on that day?    A.   Yes, sir." Witness was then asked where plaintiff was when witness first noticed him, and where witness, Vawter, was at that time.   He was then asked and answered:

"Q.   About how fast were you running?   A.   About five miles an hour."

On cross-examination of this witness by respondent, the following occurred:

"Q.   How many times had you driven a Ford car before you went to work for Lautenschlaeger?

"Judge CAVE:   I object to that as wholly immaterial.

"THE COURT:   The objection is overruled.

"Judge CAVE:   My objection is on the ground that the defendant in this case is liable or not liable according to how the accident happened.   It does not make any difference if this boy had ever driven a car before or not. Liability for a thing must be based on how the accident happened.

"THE COURT: The objection is overruled." To which ruling of the court counsel for defendants then and there duly excepted and still continues to except.

"Q.   How often had you driven a Ford car before driving this one?   A.   I drove for my brother about two months.

"Q.   For your brother?   A.   Yes, sir; he had one and he was staying with us at the time and I drove his car.

"Q.   How often?   A.   About once a week.

"Q.   For two months?   A.   Yes, sir.

"Q.   Did you drive it all day?   A.   No, sir.

"Q.   How long did you drive it at a time?   A. About half an hour at a time.

"Q.   Where was that?   A.   That was just riding around.

"Q.   In St. Louis?   A.   No; that was at Dundas.

"Q. That was the only time you have driven an automobile before you went to work for Lautenschlaeger? A. Yes, sir.

"Q. You drove it half an hour once a week for two months? A. Yes, sir.

"Q. You had no other experience with automobiles besides that? A. No, sir.

"Q. How long before you had gone to work for Lautenschlaeger was the first time you had driven that Ford car for your brother? A. About three months.

"Q. About three months since you had driven a car at all? A. Yes, sir.

"Q. How many trips did you make with this car of Lautenschlaeger's before you hit this boy? A. I never made 'airy' trip at all.

"Q. That was the first time you ever drove that car? You had only driven it a distance from where you started to where you hit the boy, is all you had ever driven that car? A. Yes, sir."

Counsel for appellants contend that, whether defendants' driver, Vawter, was, at the time of the collision with plaintiff's bicycle, competent or incompetent, experienced or inexperienced, is not a material issue in this suit, and, regardless of his experience or inexperience, the defendants are to be held liable in this action, if at all, solely because of some negligent act or omission of their employee, occurring at the time plaintiff was injured. Stating the proposition in a little different way, appellants assert that, so far as the liability of a master to a third person is concerned, his failure to hire only competent and experienced servants in itself does not constitute actionable negligence, but his liability, if any, must be predicated upon the wrongful act or omission of the servant at the time of the infliction of the injury complained of. It is, therefore, asserted that the testimony of the driver, Vawter, elicited on cross-examination, tended to show his incompetency or inexperience, and the objections of appellants thereto on the ground of

immateriality should have been sustained by the trial court. Furthermore, that the admission of such evidence was prejudicial to appellants.

Learned counsel for appellants have directed our attention to a number of decisions of foreign jurisdictions which, they claim, support their contention. We have read these cases with much interest and instruction. Some of them hold that, in an action against the master by a third person not his employee, an allegation in the petition or complaint charging the master with the employment of an unskilled or incompetent servant does not charge the master with actionable negligence, but that he is only liable in damages for the negligence of his servant occurring at the time of the injury. Other cases cited apparently hold it is error for the trial court, in an action by a stranger against the master to charge the jury, or to give an instruction allowing the jury, to take into consideration facts tending to show negligence in the employment of incompetent or inexperienced servants. Other cited cases apparently hold it is error for plaintiff to show previous negligent acts of the servant, entirely unconnected with the acts of negligence proximately causing plaintiff's injury.

A careful study and consideration of the cases cited, however, leads us to the conclusion that they are not in point in the instant case. We find no allegation in plaintiff's petition specifically charging defendants with the employment of an incompetent or inexperienced servant. The record discloses no evidence bearing on the competency or incompetency of defendants' driver to have been offered by plaintiff in his case in chief, nor is there any evidence of previous acts of negligence on the part of defendants' driver. The instructions given to the jury are not shown by the record, but the appellants' abstract of the record recites "the case was submitted by the court to the jury under the proper instructions."

Appellants offered the driver, Vawter, as their own witness. On direct examination, he was asked, "About

how fast were you running?'', and he answered, ''About five miles an hour.'' Appellants did not attempt to qualify the witness as an expert on the matter of speed, but, nevertheless, his testimony as a non-expert was entitled to consideration by the jury. It was for the jury to weigh his testimony and give to it such credit as the jury deemed it entitled to, based upon the experience, observation, and means of knowledge of the witness. [State v. Watson, 216 Mo. 420; Walsh v. Mo. Pac. Ry. Co., 102 Mo. 582; Flach v. Ball, 209 Mo. App. 389; Aston v. St. Louis Transit Co., 105 Mo. App. 226.]

It follows, we think, that respondent had the right, on cross-examination, to question the witness as to his experience, accuracy, and means of knowledge touching the speed of an automobile, in order to affect the weight of his testimony. [Johnston v. Bay State Street Ry. Co., 222 Mass. 583; Berry on Automobiles (3 Ed.) sec. 991.] The weight of his testimony as to the speed the automobile was running, is affected, to some degree at least, by the number of times, and under what circumstances, he had driven an automobile. The testimony of one who has had little or no opportunity to become acquainted with the operation and speed of an automobile is of little weight or value as compared with the testimony of one who has often driven an automobile and has had opportunity to observe and judge of its speed by reason of his actual experience. On cross-examination a witness may be asked any question which will test his *accuracy* or veracity, however irrelevant the question may be to the facts in issue. [State v. Davis, 284 Mo. l. c. 704, and cases there cited.]

In Dean v. Wabash Railroad Co., 229 Mo. l. c. 449, the conductor of a train, on direct examination as a witness for defendant, was asked what he observed of the plaintiff after the accident. On cross-examination, he was asked how many passengers were on the train and how many were injured, which question was objected to for immateriality. The trial court admitted the evi-

dence, and this court, on appeal, held the cross-examination to be legitimate.

Finally, the scope of the cross-examination of a witness is a matter which must be left largely to the discretion of the trial court. Unless that discretion is abused, the appellate courts are reluctant to interfere. [Mefford v. Railway Co., 121 Mo. App. l. c. 653; State v. Boyd, 178 Mo. l. c. 17.] We see no abuse of discretion by the trial court in this instance.

We find no error in the admission of the evidence complained of and rule the assignment against appellants.

II.   Is the verdict excessive?

Plaintiff testified that his right leg was broken about half way between the hip and knee. He was taken to a doctor and, from the doctor's office, to his home. He was confined to bed at home about seven weeks with a heavy weight and pulley attached to his leg. He was then taken to St. Mary's Hospital, where he remained in bed nine weeks. For two weeks a weight was fastened to his leg and then an operation was performed, while plaintiff was under an anæsthetic. After the operation plaintiff was put in a plaster-of-Paris cast, extending from his toes to his chest. He remained in the plaster-of-Paris cast about six weeks. He was injured on August 23, and left the hospital on December 11, 1920. He was then taken home and kept in bed until about February 20, 1921. He then sat up in a wheel chair for about two weeks, after which he walked on crutches until some time in March, and then walked for a time with the aid of a cane. During all that time, he suffered pain and still suffered at the time of the trial, nearly two years after he was injured. The pain extends from the right knee to a point half-way between the knee and hip. He is able to walk, but with a limp, and can bend his knee only half-way. He is not able to run and is never without pain in the right leg. At the time of trial, plaintiff was working for

a huckster. He gets up and down on the wagon and waits on customers. Had been thus employed about three or four months before the trial.

Dr. Yeck examined plaintiff on date of injury, about 1:30 in the afternoon. Found a complete fracture of the femur in the middle lower third of right leg. Ordered plaintiff removed to his home and put leg in a Hodgkin's splint, swinging it on a pulley with weights attached. Left it for about six weeks, then removed the weights and the bones slipped, union not having taken place. On October 7, an X-ray photograph was taken, showing an oblique fracture of the lower third of the femur and an overriding of the bones. Plaintiff was taken to hospital on the following day and an attempt made to set the bone, under an X-ray, but it would not remain. Dr. McDonald was then called and suggested the bone be plated. Weights were applied to the leg to overcome the overriding until October 22, when a silver plate was screwed to the bone to hold it in position until healing took place. After the plate was put on, additional wiring was necessary to hold it in position. Witness believed the leg had completely healed and, to a certain extent, is normal. Plaintiff has about two-thirds flexion of the knee. The plate remains attached to the bone. An irritation might be caused by the plate, making necessary its removal. Does not believe plaintiff will ever have full flexion of knee. There is more or less adhesion, which is permanent.

Dr. McDonald saw plaintiff for the first time on October 5, 1920. An X-ray photograph of plaintiff's right leg was taken on October 9, showing a fracture of the lower third of the right femur, between the knee and hip. The bone was splintered. The bones were passing each other for a distance of one and a half inches. Plaintiff was placed under an anæsthetic and an attempt made to reduce the overriding of the bones by stretching. He was put to bed with his leg in a splint and heavy weights attached to lower part of leg. After ten or twelve days, the bones were still overriding. An operation was de-

cided on, the leg cut open to the bone, separating the tissue, and an apparatus used to stretch the muscles so that the bones might be pried into place. A silver plate four inches long, using three screws on each side of the break, was then applied. Wire was fastened around the plate to prevent the pulling out of the screws by con-traction of the muscles. A drain was inserted for three days, and the limb was kept in a plaster cast for six weeks. The right leg is one inch shorter than the left leg. This is accommodated by the tilting of the pelvis, or hip bone. One hip bone sags down one inch lower than the opposite one, throwing the body out of line, and tending to make the body "lopsided." It is almost impossible for plaintiff to run and in his work there will be a strain on the muscles on the tilted side. Plaintiff has not full flexion of the knee. He can bring it back about three-quarters of the normal distance. There is a slight bow-ing of the leg. The plate has not been removed. If plain-tiff should suffer another injury there, and it should cause pain, it will be necessary to take the plate out. From forty to fifty per cent of such plates have to be removed. The method of removal is by cutting the leg open and taking the plate off. There is the risk of infection, or blood-poisoning, connected with the operation of remov-al. Witness considers the injury to the leg a permanent one.

It is apparent to us that plaintiff's injuries were se-vere and painful. He was confined to bed, at home and in the hospital, for a period of almost six months. His right leg is one inch shorter than the other, and he has not full flexion of the right knee. The testimony of his physicians is that these conditions are permanent. Plain-tiff still suffered pain at the time of trial, nearly two years after he received the injury. While $8,000 is a round sum, and although we are not bound by the judg-ment of the jury as to the amount of damages if we think the jury has been more liberal than just, nevertheless, the law has placed the duty on the jury, in the first instance,

of determining the amount of damages to be awarded. The jury had a better opportunity of judging the subject, in view of the injured boy and his witnesses, than has this court, which sees only the cold, printed record. We must defer largely to their judgment. [Dean v. Railroad Co., 229 Mo. l. c. 458.] We do not think the verdict indicates passion or prejudice on the part of the jury. Neither do we deem the verdict excessive in the light of all the testimony.

Finding no error in the record, the judgment of the trial court should be, and the same is, affirmed. *Lindsay, C.,* concurs.

PER CURIAM:—The foregoing opinion by SEDDON, C., is adopted as the opinion of the court. All of the Judges concur.